*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 30, 2024

Plaintiff-Appellee,

v

No. 363528
Barry Circuit Court
LC No. 2021-000800-FC

DEAN TERRY MYERS,

Defendant-Appellant.

Before: YATES, P.J., and CAVANAGH and BOONSTRA, JJ.

PER CURIAM.

Defendant was convicted after a jury trial of one count of assault with intent to commit criminal sexual conduct involving sexual penetration (AWI to commit sexual penetration), MCL 750.520g(1), and one count of fourth-degree criminal sexual conduct (CSC-IV), MCL 750.520e.[1] The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to serve 240 to 480 months' imprisonment for his conviction of AWI to commit sexual penetration, and 60 to 180 months' imprisonment for the CSC-IV conviction. Defendant now appeals by right, arguing that defense counsel provided ineffective assistance of counsel by not presenting witnesses at trial to testify about the possible closure of the park at the time of the assault and for not objecting to the prosecution's expert's vouching testimony that was plainly erroneous. Defendant also argues that the cumulative effect of these errors warrants reversal of his convictions and a new trial. Additionally, defendant argues that his departure sentence was based on acquitted conduct and was disproportionate to the crime. For the reasons set forth in this opinion, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of defendant's sexual assault of the victim sometime in the winter of 2018 or early 2019. Defendant was a friend of the victim's mother and frequently came to their house to smoke methamphetamine. One morning in the winter of 2018 or early 2019, defendant

---

[1] Defendant was acquitted of one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(f).

drove the victim to school after she woke up late and missed the school bus. The victim testified that defendant first took her to McDonald's to have breakfast and then to Fish Hatchery Park in Hastings, Michigan, where he parked the vehicle, moved toward her, and grabbed her. She testified that defendant put his finger inside her pants and then placed his fingers inside of her. She testified that defendant told her to "shut up" and grabbed her throat. She testified that she was pushing and kicking defendant away as the assault continued for about one minute. She testified that when defendant stopped, he "said if I ever told anybody he'd kill my mom and make me watch and he'd finish the job." The victim testified that defendant dropped her off at school afterward at about 10:00 a.m.

The victim reported the incident to police in May 2021 with the help of a school counselor. Defendant was interviewed by detectives in June 2021 and denied assaulting the victim, although he acknowledged that he took her to school that day. Defendant was arrested shortly afterward. After a jury trial in June 2022, defendant was found guilty of AWI to commit sexual penetration and CSC-IV, but acquitted of CSC-I. Defendant moved for a new trial, arguing that defense counsel was ineffective and requesting an evidentiary hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). The trial court held a hearing and ultimately denied defendant's motion. Defendant now appeals.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL IN INVESTIGATING AND PRESENTING WITNESSES

Defendant argues that defense counsel was ineffective because she did not explore the possibility that Fish Hatchery Park likely would have been closed at the time of the assault by presenting witnesses at trial, which would have cast reasonable doubt on the victim's testimony. We disagree.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). If the trial court has held a *Ginther* hearing, the trial court "first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *Id*. We review the trial court's factual findings for clear error. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). A trial court's finding "is clearly erroneous when, although there is evidence to support it, the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859, amended 481 Mich 1201 (2008) (quotation marks and citation omitted).

In *People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011), the Michigan Supreme Court stated:

> A defendant must meet two requirements to warrant a new trial because of the ineffective assistance of trial counsel. First, the defendant must show that counsel's performance fell below an objective standard of reasonableness. In doing so, the defendant must overcome the strong presumption that counsel's assistance constituted sound trial strategy. Second, the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable.

"Counsel always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Trakhtenberg*, 493 Mich at 52 (quotation marks and citation omitted). Decisions "regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy," which we "will not second-guess with the benefit of hindsight." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004) (quotation marks and citation omitted).

Here, both the victim and her mother testified that they could not remember the exact date of defendant's assault. The victim's attendance records showed that she was tardy for four days between November and December 2018, but she arrived before 8:55 a.m. on each of those days. Her attendance records showed one three-hour absence the morning of January 9, 2019. The victim testified that when she and defendant arrived at Fish Hatchery Park, it was about 9:00 a.m., and the park was empty. Detective Sergeant Karen Larson testified that after the winter of 2018, Spectrum Health bought Pennock Hospital, located across the street from the park, and "worked with the city to open Fish Hatchery Park during the wintertime, so the employees could park" there; before that, the park was always closed in the wintertime, and it was not unusual for the park to be empty. The victim testified that the park was completely empty when defendant drove her there. During closing argument, defense counsel mentioned this testimony and stated that there was "a possibility that the park wasn't even open in 2018. That it was still closed as [it] was traditionally."

After his trial and sentencing, defendant moved for a new trial. Defendant attached to his motion a copy of the Hastings City Council meeting on January 14, 2019, which showed that the city was still tentatively working toward an arrangement to lease the Fish Hatchery Lot parking lot to Spectrum Health. This demonstrated that regardless of whether the assault took place in the winter of 2018 or in early January 2019, the parking lot was not open to hospital employees until afterward.

During defendant's evidentiary hearing, defense counsel testified that she was aware that the driveway in the Fish Hatchery Park was traditionally closed in the winter because she conducted a proper investigation and called the city. However, she discovered that the park was not inaccessible while it was closed because the gate was only secured with a bungee cord that was not locked. Therefore, as a matter of trial strategy, she decided not to call any witnesses at trial to testify about the matter, as to not call attention to the fact that the gate was easily accessible. Other witnesses at the evidentiary hearing testified that there were city employees who would undo the bungee cord and drive in, and then lock it back up on their way out. They testified that it was "absolutely possible" that the gate was left open in December 2018 or January 2019 if someone was working in the park, and they confirmed that there was never a lock on the gate. A police officer who frequently entered the park in the winter testified that he sometimes forgot to secure the gate back with the bungee cord when he left.

After the testimonies were complete, the trial court stated that

what you [appellate counsel] presented here today, didn't convince me more likely that the park was closed. . . . After I heard all the testimony, I thought huh, pretty easy to get in and out of the park. Park is opened occasionally in the winter, I'm sure if the gate's open, people go in there . . . you didn't convince me more, then

-3-

not, today. From my perspective. If I were a juror, I wouldn't have felt more sure that [defendant] could not, did not get into the park.

The trial court ultimately denied defendant's motion, stating that it did not find defense counsel ineffective because it was reasonable trial strategy for her to decide not to explore the closure of the park further since the prosecution could have called forward a witness like the police officer to testify that it was easy to open the park gate and that he forgot to close it at times. The trial court also stated that the

> weight of the prejudice in this case is miniscule in my mind, if existent at all . . . there was so much other stuff in this case that corroborated what happened. The additional testimony, I don't think would've strengthened the defendant's case at all. In fact, I found it to have potentially weakened the defendant's case.

The trial court's findings were not erroneous. See *Trakhtenberg*, 493 Mich at 47. The trial court stated that defense counsel's performance did not fall below an objective standard of reasonableness, see *Armstrong*, 490 Mich at 290, because defense counsel's decision not to explore the closure of the park further was "reasonable trial strategy." The trial court stated that defense counsel "did her inquiry, and she called and found that it was closed. It was closed with a bungee . . . She said it was a strategy, she said I didn't want to get further into it because" it may have highlighted the fact that the bungee was easy to open and the park gate was left open sometimes by city employees or police officers. The trial court acknowledged that defense counsel's decision regarding whether to call witnesses was a matter of trial strategy that will not be second-guessed "with the benefit of hindsight," *Dixon*, 263 Mich at 398: "I think under the first prong that what she did was reasonable. She did the inquiry and I think it was a reasonable trial strategy. Of course . . . we always question that later. That's your job [referring to appellate counsel]."

Furthermore, in *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994), our Supreme Court held that defense counsel "must be afforded broad discretion in the handling of cases, which often results in taking the calculated risks which still do sometimes, at least, pluck legal victory out of legal defeat." *Id.* at 325 (quotation marks and citation omitted). A "particular strategy does not constitute ineffective assistance of counsel simply because it does not work." *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004).

The trial court also found that defendant did not show that a different result would have been reasonably probable even if defense counsel called witnesses to testify about the park's closure, see *Armstrong*, 490 Mich at 290, because the "weight of the other evidence in this case, again, if it were a he-said, she-said, then—there was so much other stuff in this case that corroborated what happened." The trial court stated that any additional testimony about the park's closure would have "potentially weakened the defendant's case" rather than strengthening it.

As the trial court concluded, defense counsel's failure to call witnesses on this issue likely would not have made a difference in the outcome of the trial. It was established during defendant's evidentiary hearing that the bungee cord around the gate at the park was never locked, that it could be easily removed by city employees and the public, and that there were times when the gate was left open in the winter. It was also established that, regardless of whether the assault took place in

December 2018 or January 2019, Pennock Hospital employees were not parking in the park at the time.

Defendant argues that the closure of Fish Hatchery Park would have cast sufficient doubt on the victim's story to merit a new trial, citing the Michigan Supreme Court's decision in *People v Alexander*, 500 Mich 1016; 896 NW2d 421 (2017), in support of his argument.

First, the credibility of witnesses and the weight given to their testimonies are matters for the fact-finder to determine, and we do not interfere with those determinations. *People v Lemmon*, 456 Mich 625, 642; 576 NW2d 129 (1998); *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997). The victim's testimony was believed by the jury in order to convict defendant of AWI to commit sexual penetration and CSC-IV. Defendant speculates, without proof, that with further information on the closure of the park, the jury would have doubted the victim's credibility and the weight of her testimony to the point of changing its verdict. Defendant argues further on this point that, because he was acquitted of CSC-I, it is apparent that the jury already had issues with the victim's credibility. This argument is unavailing because the jury's acquittal of defendant's CSC-I charge did not equate with an issue with the victim's credibility, but only that the jury found that the prosecutor did not prove the elements of CSC-I beyond a reasonable doubt. See *People v Brown*, 339 Mich App 411, 422; 984 NW2d 486 (2021) (stating that a jury's acquittal on a particular charge is a finding "that the prosecutor failed to prove one or more of the elements beyond a reasonable doubt").

Second, the situation in *Alexander* is distinguishable from the present case. See *People v Alexander*, unpublished per curiam opinion of the Court of Appeals, issued October 6, 2016 (Docket No. 332700), vacated in part and remanded 500 Mich 1016 (2017). The victim in *Alexander* testified that the defendant, her stepfather, sexually assaulted her on three occasions. *Id*. at 1. At the preliminary hearing, the victim testified about one occasion of sexual assault that took place in her bedroom on a day when she stayed home from school because of illness. *Id*. During trial, however, the victim testified that she stayed in school that day despite her illness because her mother texted her and told her to do so. *Id*. The defendant moved for an evidentiary hearing, producing telephone records that showed that the victim's mother did not text her on that day, and arguing that the victim committed perjury. *Id*. at 2. The trial court granted the defendant a new trial, stating that the evidence "could have made a difference," and the prosecution appealed. *Id*.

Relying on *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003), this Court reversed the order, stating that "the telephone records do not expose an egregious untruth that would undermine the victim's credibility to the point that it would make a different result probable on retrial." *Alexander*, unpub op at 3. The Michigan Supreme Court vacated this Court's decision in part, stating that

> [a]lthough the Court of Appeals correctly concluded that the trial court applied an improper standard in granting a new trial based on newly discovered evidence, it erred in further determining that the new evidence would not justify the grant of a new trial. The evidence—the discovery of the complainant's cell phone records— was *newly discovered*, was *not cumulative*, and could not have been discovered with reasonable diligence and produced at trial. Whether this evidence makes a different result probable on retrial . . . should first be determined by the trial court.

[*Alexander*, 500 Mich at 1016 (quotation marks and citation omitted; emphasis added)[2].]

In the present case, unlike the telephone records in *Alexander*, the evidence discovered after trial about Fish Hatchery Park's closure was not "newly discovered." Detective Sergeant Larson testified at trial about how, after the winter of 2018 and 2019, the Fish Hatchery Park parking lot was opened for hospital employees, but before that, the park was closed in the wintertime and was empty. Defense counsel mentioned this testimony in her closing argument and stated that there was a possibility that the park was not open at the time of the assault.

Defense counsel testified at the evidentiary hearing that she called the city before trial to ask about the accessibility of the park at the time of the assault and discovered that the park was traditionally closed in the winter, but that there was no secure lock or latch, only a bungee cord, and people tended to open the gate. She decided as part of her trial strategy to not elaborate further on the issue at trial at risk of bringing attention to the fact that the park, while closed, was still accessible through the removal of an unsecured bungee cord. The other testimony presented at the evidentiary hearing did not present anything "newly discovered," only that, again, employees were not parking in the park at the time of the assault, that the gate to the park was closed, and that it was easily accessible through the removal of a bungee cord with no secure lock attached to it.

If "merely cumulative, newly discovered evidence" does not satisfy the requirements for granting a new trial. *People v Grissom*, 492 Mich 296, 313 n 18; 821 NW2d 50 (2012). The evidence presented at defendant's evidentiary hearing, unlike the telephone records in *Alexander*, was cumulative as it did not prove anything that had not already been established at trial or through defense counsel's pretrial investigation.

The trial court correctly found that defendant failed to show that defense counsel's performance fell below an objective standard of reasonableness or that, but for defense counsel's performance, a different result was reasonably probable. See *Armstrong*, 490 Mich at 290. Accordingly, defendant is not entitled to a new trial.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO OBJECT TO VOUCHING TESTIMONY

Defendant argues that a portion of Detective Sergeant Larson's testimony was improper testimony vouching for the truthfulness of the victim's testimony and that, therefore, defense counsel was ineffective because she did not object to this testimony, and the trial court plainly erred by admitting the testimony. We disagree.

Generally, we review for an abuse of discretion a trial court's decision to admit or exclude evidence. *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003). We, however, review

_____

[2] "Supreme Court orders that include a decision with an understandable rationale establish binding precedent." *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).

unpreserved evidentiary issues for plain error affecting defendant's substantial rights. *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).

> First, there must be an error; second, the error must be plain (i.e., clear or obvious); and third, the error must affect substantial rights (i.e., there must be a showing that the error was outcome determinative). Moreover, reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of guilt or innocence. [*Id*. (citations omitted).]

"[I]t is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial." *People v Musser*, 494 Mich 337, 349; 835 NW2d 319 (2013). In childhood sexual-abuse cases, "(1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty." *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995). For example, in *Peterson*, the Court held that "the experts . . . improperly vouched for the veracity of the child victim" by testifying "that children lie about sexual abuse at a rate of about two percent" and that "there is about an eighty-five percent rate of veracity among child abuse victims." *Id*. at 375-376. In *People v Hawkins*, 507 Mich 949; 959 NW2d 179, 179-180 (2021), a police detective testified that

> the complainant's demeanor during her interview was consistent with that of a typical child sexual assault victim and that, given his specialized training, the complainant's testimony "seemed authentic to [him]." In addition, the detective testified that he tried but was unable to find inconsistencies in the complainant's allegations, stating, "[I]f I can't prove that [the abuse] didn't happen, then there's a good possibility that it did," seemingly shifting the burden of proof to defendant to prove his innocence. The detective also testified that, on the basis of his investigation, he found defendant's suggestion that the complainant made up the abuse allegations to get her father's attention to be "[n]ot true."

The Court held that this testimony "improperly vouched for the complainant's credibility and improperly commented on the defendant's guilt." *Id*. at 180. In *People v Thorpe*, 504 Mich 230, 259; 934 NW2d 693 (2019), the Court held that the expert's testimony that "only 2% to 4% of children lie about sexual abuse" and his identification of "only two specific scenarios in his experience when children might lie, neither of which applies in this case" led to the reasonable conclusion "that there was a 0% chance [the victim] had lied about sexual abuse. In so doing, [the expert] for all intents and purposes vouched for [the victim's] credibility."

In the present case, after affirming on cross-examination that she had experience with child sexual-abuse victims who lied and had false memories, on redirect examination, Detective Sergeant Larson affirmed that in such child-sexual-abuse cases, "there [is] usually something done demonstrably false that is provable," like lacking "an alibi or just concrete evidence that it didn't happen." She also testified that it was "more unusual" for false allegations to happen.

During defendant's evidentiary hearing, appellate counsel argued that the analysis from *Hawkins* and *Thorpe* applied to the present case because Detective Sergeant Larson testified that

false allegations are rare and that, when they do happen, they are "demonstrably false. So, putting those things together, the takeaway for the jurors was this was not a case of a false allegation. And so this is what I would refer to as circumstantial vouching." The trial court denied defendant's motion, stating:

> I think the question here [is], what kind of questions, how much? What's the extent? And, I think that's what all the case law. The cases you cite, they're not the same as our case. I get why you cited them, I would've too. But, I think it's all continuum. And, I can tell you when I heard this . . . it didn't raise red flags with me. . . . And vouching is—is a real potential problem. I didn't get that feeling. And, I don't think I was sleeping. But I didn't get that feeling when this came up. It didn't feel like that to me.

The trial court's findings were not erroneous. See *Trakhtenberg*, 493 Mich at 47. The trial court stated that defense counsel's performance did not fall below an objective standard of reasonableness, see *Armstrong*, 490 Mich at 290, because Detective Sergeant Larson's testimony was distinguishable from *Hawkins* and *Thorpe*. In *Hawkins*, 959 NW2d 179-180, the detective testified specifically about the authenticity of the victim's and defendant's testimonies. In *Thorpe*, 504 Mich at 259, the expert testified about specific percentage statistics and two "specific scenarios in his experience when children might lie." In contrast, Detective Sergeant Larson simply answered "[y]es" to two questions from defense counsel about whether she had known victims to lie or to have false memories in CSC cases. The prosecutor expanded on those questions on redirect examination, and Detective Sergeant Larson confirmed that there is usually something "demonstrably false" that is provable in CSC cases involving lies or false memories, and she testified that it is "more unusual" for false allegations to happen.

Furthermore, in *Thorpe*, 504 Mich at 253, the defense counsel objected to the expert's testimony "that children only lie about sexual abuse 2% to 4% of the time." The trial court overruled the objection because defense counsel raised the question of children lying on cross-examination, and therefore, "opened the door to the prosecution's line of questioning on redirect examination." *Id*. The Michigan Supreme Court disagreed with the trial court, stating:

> Defense counsel did not open the door to [the expert's] testimony regarding the rate of false reports in child sexual abuse cases simply by asking him on cross-examination whether children lie or manipulate. Counsel did not ask [the expert] about the frequency with which children lie, whether children make false allegations of sexual abuse, or whether he has had any experience with false accusations in his own practice. We agree with [defendant] that defense counsel's questions to [the expert]—"let me ask you this, kids can lie, true?" and "[a]nd they can manipulate[?]"—were discrete, straightforward, and uncontroversial questions of fact. To maintain that these basic questions *invited* the prosecution to elicit expert testimony from [the expert] that children lie about sexual abuse 2% to 4% of the time would essentially require defense counsel to read tea leaves before asking any questions. [*Id*. at 254 (alterations in quote marks in original).]

Unlike in *Thorpe*, on redirect, the prosecutor did not ask Detective Sergeant Larson about the frequency with which children lie or to identify any specific scenarios in her practice in which

children lied. The prosecutor's questions, like defense counsel's questions, were "discrete" and "straightforward." *Id*. The trial court stated during defendant's evidentiary hearing that "I just don't think this rises to the level of the vouching that would . . . create plain error here." Accordingly, there was no error in the admission of the testimony because the testimony was not improper vouching testimony.

Detective Sergeant Larson never testified about specific statistics or referred to the victim's testimony. She did not testify about any specific scenarios, only that in her experience, it was unusual for false allegations to occur. Unlike the expert in *Thorpe*, 504 Mich at 259, Detective Sergeant Larson's testimony was vague, and it did *not* lead to the conclusion "that there was a 0% chance [the victim] had lied about sexual abuse" or any similar conclusion. Therefore, Detective Sergeant Larson's testimony was not vouching for the victim's credibility.

The trial court also found that defendant did not show that a different result would have been reasonably probable even if defense counsel objected, see *Armstrong*, 490 Mich at 290, because Detective Sergeant Larson's testimony was not improper vouching testimony, and therefore, was not objectionable. "[T]rial counsel cannot be faulted for failing to raise an objection or motion that would have been futile." *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

Moreover, defendant cannot show that, but for counsel's allegedly deficient performance, a different result would have been reasonably probable because, even excluding Detective Sergeant Larson's allegedly improper testimony, sufficient evidence supported the convictions. The victim herself testified at trial regarding the assault, and her testimony did not need to be corroborated. See MCL 750.520h. Regardless, her friend corroborated the allegations by testifying about the victim's disclosure in the immediate aftermath of the assault. And, during his police interview, defendant himself made sexual remarks about the victim, and he admitted that "he may have kissed her, he may have hugged her, [but] he was up all-night smoking meth and he wasn't sure."

The trial court correctly found that defendant failed to show that defense counsel's performance fell below an objective standard of reasonableness or that, but for defense counsel's performance, a different result was reasonably probable. See *Armstrong*, 490 Mich at 290. Because the testimony was not improper vouching testimony, the trial court did not plainly err by admitting the testimony and such testimony did not affect defendant's substantial rights. Accordingly, defendant is not entitled to a new trial.

## IV. CUMULATIVE ERROR DOCTRINE

Defendant argues that, considered cumulatively, the trial court's errors in finding that defense counsel's representation did not violate his right to effective assistance of counsel and the erroneous admission of improper vouching testimony amount to error requiring reversal. We disagree.

We review a cumulative-error argument "to determine if the combination of alleged errors denied defendant a fair trial." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even

when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Id*.

The cumulative error doctrine recognizes that "the cumulative effect of a number of minor errors may in some cases amount to error requiring reversal[.]" *People v Cooper*, 236 Mich App 643, 659-660; 601 NW2d 409 (1999). "In making this determination, only actual errors are aggregated to determine their cumulative effect." *LeBlanc*, 465 Mich at 591 n 12 (quotation marks and citation omitted).

Overall, defendant failed to establish that any actual errors occurred. In the absence of such errors, "there can be no cumulative effect of errors meriting reversal." *Dobek*, 274 Mich App at 106. Even if defendant established the occurrence of any errors, given the evidence presented against defendant to establish his conviction and the fact that the jury's verdict likely would have been the same with or without any of the alleged errors, the cumulative effect of any errors did not deny defendant a fair trial or constitute sufficient prejudice to warrant reversal. See *id*. Accordingly, defendant is not entitled to a new trial.

## V. REASONABLENESS OF DEPARTURE SENTENCE

Defendant argues that he is entitled to resentencing because the trial court based its upward-departure sentence on acquitted conduct and the sentence was disproportional to the crime committed. We disagree.

Sentences that depart from the guidelines are reviewed for reasonableness. *People v Lockridge*, 498 Mich 358, 365; 870 NW2d 502 (2015). And "appellate review of departure sentences for reasonableness requires review of whether the trial court abused its discretion by violating the principle of proportionality set forth in our decision in *Milbourn*."[3] *People v Steanhouse*, 500 Mich 453, 477; 902 NW2d 327 (2017). This Court reviews the trial court's factual determinations at sentencing for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Antwine*, 293 Mich App 192, 194; 809 NW2d 439 (2011) (quotation marks and citation omitted). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438.

Charges for which a defendant was acquitted cannot be considered during sentencing. In *People v Beck*, 504 Mich 605, 608-609; 939 NW2d 213 (2019), the Supreme Court considered whether "[o]nce a jury acquits a defendant of a given crime, may the judge, notwithstanding that acquittal, take the same alleged crime into consideration when sentencing the defendant for *another* crime of which the defendant was convicted?" The Court held that the answer is no. *Id*. at 609. "Once acquitted of a given crime, it violates due process to sentence the defendant as if he committed that very same crime." *Id*. The Court's reasoning was that, unlike dismissed charges or uncharged conduct, once a defendant is acquitted of a crime, the defendant is presumed innocent

---

[3] *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990).

of that crime, and "conduct that is protected by the presumption of innocence may not be evaluated using the preponderance-of-the-evidence standard without violating due process." *Id*. at 627.

> In *Brown*, 339 Mich App at 421-422, this Court stated that

> the jury does not make an affirmative finding of innocence when it acquits a defendant of a particular charge. . . . [W]hen a jury acquits a defendant on a particular charge, the jury does not conclude that the defendant is factually innocent of that charge; rather, it simply finds that the prosecutor failed to prove one or more of the elements beyond a reasonable doubt.

This Court defined "acquitted conduct" as "a concept based not on the existence of sufficient evidence, but rather one based on the absence of such evidence[.]" *Id*. at 422. This Court discussed two possible approaches to identify acquitted conduct: a "categorical approach," in which "*any evidence* that relates to *any element* of the crime of which the defendant was acquitted would have to be discarded at sentencing," *id*. at 422, and a "rational-jury approach," in which,

> [r]ather than focus[ing] on all of the conceivable grounds upon which a jury could have theoretically acquitted the defendant—even those grounds, for example, that were conceded by the defense or otherwise uncontested by the parties—the focus would be on the grounds that the parties actually put in dispute at trial. [*Id*. at 423-424.]

This Court rejected the categorical approach, stating that it would lead to "absurd results" because it would mean "that any fact or circumstance related to any element of the acquitted crime would be off-limits at sentencing, even if the same fact or circumstance was also related to the convicted crime." *Id*. at 423. This Court held that the rational-jury approach was the best approach to identify acquitted conduct because

> if a specific fact or circumstance was relevant to both the acquitted charge and the convicted charge—i.e., if there was an overlap of relevant conduct—then the trial court could consider that fact or circumstance when sentencing on the convicted charge. This rational-jury standard appears to be consistent with *Beck* and its progeny, and it is a workable standard that trial courts can use when sentencing a defendant who was convicted of a particular charge but also acquitted of another related charge. [*Id*. at 425.]

We review departure sentences for reasonableness by determining "whether the trial court abused its discretion by violating the 'principle of proportionality' . . . 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Steanhouse*, 500 Mich at 459-460, quoting *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). See also *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010). The court should ensure that the "sentences imposed across the discretionary range are proportionate to the seriousness of the matters that come before the court for sentencing." *Milbourn*, 435 Mich at 651. To determine whether a sentence is "proportional," the court "must take into account the nature of the offense and the background of the offender." *Id*. The *Milbourn* Court emphasized that trial courts should not apply their "own philosophy of

sentencing," but rather determine where the defendant's case falls on a scale of the "least to the most serious situations," and impose a sentence on the basis of that determination. *Id*. at 653-654.

Although the sentencing guidelines are advisory, trial courts must still consider the guidelines when imposing a sentence. *Lockridge*, 498 Mich at 365, 391-392. When a trial court departs from the sentencing guidelines, it must be for reasons not adequately reflected in the "guidelines variables." *Milbourn*, 435 Mich at 659. Trial courts "may continue to depart from the guidelines when . . . the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime." *Id*. at 657. However, if the trial court imposes a departure sentence that is "unsupported by reasons not adequately reflected in the guidelines variables," it may be possible that the trial court "abused its discretion" in sentencing the defendant. *Id*. at 658, 659-660.

To determine whether a sentence outside the guidelines range is more proportionate than a sentence within the guidelines, the court may consider "(1) whether the guidelines accurately reflect the seriousness of the crime; (2) factors not considered by the guidelines; and (3) factors considered by the guidelines but given inadequate weight." *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017) (citations omitted).

Defendant was acquitted of one count of CSC-I and found guilty of AWI to commit sexual penetration and CSC-IV. At the beginning of defendant's sentencing hearing, the trial court acknowledged that the minimum sentencing guidelines range for defendant's AWI to commit sexual penetration conviction was 38 to 152 months. The prosecutor then stated:

> [Defendant] was convicted of attempting to rape a 15-year-old as he took her to school. The reason he didn't is because she fought him off for a significant period of time. She testified to all of that. If he had been successful and she hadn't fought him off, his guidelines would have been 126 to 420 months.
>
> So, I'm gonna ask for 240 to 480 months. That's the lower half of what it would have been if he was successful. If she hadn't been successful in fighting him off. That is more consistent with his elevated criminal history.
>
> He has 7 felonies and 14 misdemeanors. His [Prior Record Variable] level is 105, well above the 75 maximum for [PRVs]. That sentence is also more consistent with the severe trauma that he has caused to the victim. This happened three and a half years ago and the Court can see she was still terrified of him during the trial.
>
> * * *
>
> And that's why the delay [in reporting the incident], because [defendant] said, "I'm gonna kill your mom, make you watch, and come back and finish the job." And so, she believed him. . . . And she's still worried about him. Still terrified of him. . . . The friend . . . who covered her in the bathroom was still crying about that memory three-and-a-half years later. Mom talked about how her child behavior changed completely before he attempted to rape her and then afterwards. That she lost her kid, that she can't hug her kid anymore.

So, his sexual assault affected the whole family and it . . . affected the friend. So, the 20 to 40 I think is a reasonable proportional sentence to what his intent was that day. His intent was to rape her and she fought him off. And it's reasonable and proportional given the psychological trauma that the victim suffered and the family has suffered and his criminal history, your Honor.

Defense counsel responded that the original recommendation of 38 to 152 months was "very fair" because it "takes into account what he was found guilty of, not what he was charged with. And that's why we're here for today, Judge."

The trial court sentenced defendant to 240 to 480 months' imprisonment, stating:

For the record, first of all, I'm adopting all the arguments made by the prosecutor in this case regarding sentencing. I'm also noting, for the record, that the recommendations that are given in these presentence reports are not in fact recommendations from local Department of Corrections who know these individuals, know the victims.

The best intimately [sic], many times, they've actually had them on probation before. But instead, now Lansing, someone from Lansing who knows nothing about the case is now reviewing and modifying, changing, the recommendations. Basically, because they want to keep people out of prison; not because it's a true and accurate reflection.

And that's just the truth. So, the recommendations that are given in these reports have very little value, in fact. Almost everything that I'm to consider when looking at the guidelines and what I'm to consider and tell the Court of Appeals if I'm going to go above the guidelines, and I am, was reflected by the prosecutor and I adopt the seriousness of the crime. If you look at it proportionality [sic], the seriousness [of the] crime—this was serious, this was very very fortunate that it did not get worse and fortunate that this young lady did fight. . . .

It [the guidelines] doesn't also take into account the different people that are affected by this. You have to know that the young lady who found her, her friend who found her in the bathroom, you know, cowering in a corner shaking like a leaf and crying. That young lady has to be affected, is affected, we saw and heard her testify, has to be affected by this forever as well. As is the mom who was told that he threatened he was gonna kill her and kill her in front of his (sic) daughter.

The defendant has been in prison twice before. Once when out on parole, he violated and had to be sent back to prison, his prison sentence is more significant, one was five to ten years. So, these weren't, you know, 13-month prison sentence before, it's been significant. That didn't seem to change or affect the defendant . . . . He's had plenty of opportunities to get help, to be rehabilitated and it hasn't proved to work. The charges are serious, there's methamphetamine, home invasion, and B and E with intent; those are serious things.

He's clearly a danger to society. I find every factor that they want me to look at, when I'm thinking about going above the guidelines, tells me that this is an above the guidelines sentence. It has to be proportionate. A sentence within the guidelines is not proportionate of what happened here. I agree with the prosecutor. I had already, in fact, made notes myself here, which are very similar to what the prosecutor's recommendations are.

Defendant first argues that by considering his attempt and intent to commit sexual penetration during sentencing, the trial court imposed the sentence as though defendant had been convicted of CSC-I, thereby violating his due-process rights under *Beck*, 504 Mich at 609. This argument is not persuasive.

The most striking difference between the acquitted CSC-I charge and the convicted AWI to commit sexual penetration charge is the element of *actual* penetration versus the element of *intention* to penetrate. During trial, the victim testified that defendant sexually penetrated her with his fingers during the sexual assault. Under *Beck*, 504 Mich at 609, the trial court could not have sentenced defendant as though he actually sexually penetrated the victim in the exact way that the victim alleged he did because the jury acquitted defendant of CSC-I, thereby finding that the prosecutor failed to prove one or more of the elements of the charge beyond a reasonable doubt. See *Brown*, 339 Mich App at 422. However, the jury's acquittal of defendant's CSC-I charge did not mean that defendant was factually innocent of any and all intent to sexually penetrate the victim, only that the prosecution failed to prove beyond a reasonable doubt that defendant sexually penetrated the victim in the exact way that was alleged during trial. See *id*. Therefore, during sentencing, the trial court was free to consider the fact that defendant intended to commit any sexual act involving criminal sexual penetration and that the only reason defendant did not commit this act was because the victim prevented it from happening.

The fourth element for AWI to commit sexual penetration states that defendant "intended to commit a sexual act involving criminal sexual penetration." The prosecutor's argument during sentencing was essentially that defendant should be sentenced on the basis of his *intent* to sexually penetrate the victim, although he was not successful, because in convicting defendant of AWI to commit sexual penetration, the jury found beyond a reasonable doubt that defendant *intended* to do so. In imposing defendant's sentence, the trial court adopted "all the arguments made by the prosecutor in this case regarding sentencing." The trial court did not sentence defendant on the basis of acquitted conduct, or as though he was convicted of CSC-I, but rather, on the basis of his attempt and intent to commit sexual penetration, considering conduct that related to both the acquitted charge and the convicted charge, which was not erroneous. See *id*. at 425.

Defendant next argues that his upward-departure sentence was imposed on the basis of the notion that he would have been guilty of a more serious crime if his intent to commit sexual penetration was successful and that this rationale was not a valid basis for imposing an upward-departure sentence because it would justify such a sentence in every AWI to commit sexual penetration case. In support of his argument, defendant cites this Court's holding in *Dixon-Bey*, 321 Mich App at 529, that a departure sentence cannot be imposed on the basis of factors that are "not unique to defendant or otherwise relevant to a proportionality determination." This argument is not persuasive.

-14-

In *Dixon-Bey*, the defendant was convicted of second-degree murder after stabbing the victim, her boyfriend, to death. *Id.* at 494-495. The defendant argued that the trial court's upward-departure sentence was unreasonable. *Id.* at 495. This Court remanded for resentencing, stating that "the trial court did not adequately explain why a minimum sentence of 35 years was more proportionate than a different sentence within the guidelines would have been." *Id.* at 525. The *Dixon-Bey* defendant had a PRV score of zero points and an entirely nonviolent criminal history; additionally, "most, if not all, of the factors discussed by the trial court to support its departure sentence were contemplated by at least one offense variable (OV)." *Id.* at 525-526. This Court concluded that

> factors relied on by the trial court were not unique to defendant or otherwise relevant to a proportionality determination. The trial court highlighted the victim's standing in the community and defendant's attempts to minimize her role in the stabbing. Neither factor is, in our view, unique to defendant's crime, nor supported by the record. [*Id.* at 529.]

The present case is distinguishable from *Dixon-Bey* in regard to both defendant's criminal history and the factors the trial court relied upon to impose the upward-departure sentence.

First, unlike the defendant in *Dixon-Bey*, defendant's PRV score was 105, exceeding the 75-point maximum under MCL 777.51(1)(a). Defendant has 21 cases of adult criminal history listed in his presentence investigation report, including seven prior felony convictions: two instances of breaking and entering a building with intent, four instances of possession of a controlled substance, and one instance of third-degree home invasion. The trial court considered defendant's criminal history in imposing the upward-departure sentence, noting that defendant was imprisoned twice before on "serious" charges and that his prison sentences were "significant." The trial court emphasized that the defendant's time in prison "didn't seem to change or affect" him and that he "had plenty of opportunities to get help, to be rehabilitated and it hasn't proved to work. He's clearly a danger to society."

When justifying an upward departure from the sentencing guidelines, trial courts may consider a defendant's "repeated offenses and [past] failures at rehabilitation." *People v Horn*, 279 Mich App 31, 44; 755 NW2d 212 (2008). Additionally, when considering the proportionality of a sentence, the "protection of society" is a factor that should be considered by the trial court. *People v Bennett*, 335 Mich App 409, 418; 966 NW2d 768 (2021) (quotation marks and citation omitted). The trial court's departure sentence was reasonable and proportionate because the court gave adequate weight to defendant's criminal history considering the seriousness of the crime. See *Milbourn*, 435 Mich at 657.

Second, unlike the trial court in *Dixon-Bey*, 321 Mich App at 524, 529, the trial court considered factors not considered by the minimum sentencing guidelines in imposing the departure sentence, and these factors were unique to defendant's crime and supported by the record. The trial court stated that the guidelines did not "take into account the different people that are affected by this," including one of the victim's friends and the victim's mother.

The record shows that the victim's friend testified that she first found the victim in the school bathroom after the assault and comforted her. She testified that she was "very concerned.

Really scared, 'cause she hadn't cried like that—I've never seen her cry like that," and that as the victim cried, "I'm crying with her." The victim's friend agreed in her testimony that the events were still hard for her to talk about it. The record also shows that the victim's mother testified about the changes in the victim's behavior and appearance since the assault: "The kid I used to have as like a tiny little thing and like this happened and she gained like a hundred pounds and she just, like, stopped liking school." She testified that the victim "totally flipped into a different kid" and that she no longer wanted to go outside, lost all her friends, was always angry. She agreed in her testimony that the victim used to like hugs, but now "you can't give her a hug. . . . You can't touch her. She freaks right out." These factors are unique to defendant's case, supported by the record, and relevant to a proportionality determination. See *id*. at 529. The trial court demonstrated that a sentence outside the guidelines was more proportionate, considering the facts of the case, than a sentence within the guidelines. See *Milbourn*, 435 Mich at 657.

Defendant's sentence was not imposed on the basis of acquitted conduct and was proportional to the seriousness of the crime because it considered defendant's criminal history and was imposed on the basis of factors that were not considered by the guidelines. See *id*.; *Dixon-Bey*, 321 Mich App at 525. Therefore, the trial court's upward-departure sentence did not violate the principle of proportionality. Accordingly, defendant is not entitled to resentencing.

Affirmed.

/s/ Christopher P. Yates
/s/ Mark J. Cavanagh
/s/ Mark T. Boonstra